United States District Court
District of Connecticut
FILED AT BRIDGEPORT
4/12                        20 21
Robin D. Tabora, Clerk
By____S. Imbriani____
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR SEARCH WARRANTS, AUTHORIZATION FOR ARREST WARRANT, AND ISSUANCE OF CRIMINAL COMPLAINT | Case No. 3:21MJ____ (SDV) 360 **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS AND AUTHORIZATION FOR ARREST WARRANT AND CRIMINAL COMPLAINT**

I, Brian Hanko, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND BACKGROUND OF AFFIANT**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2017. My experience as an FBI Special Agent has included the investigation of violent crimes, counterintelligence, and public corruption.  Since 2020, I have been assigned to investigate human trafficking and violent crimes against children and have participated in multiple investigations involving child exploitation, trafficking of child pornography, and online enticement of minors.  I received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal law procedures.  I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request search and arrest warrants.

2.      I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      FBI is investigating HECTOR TORRES, with a date of birth of xx-xx-1989, relating to coercion and enticement of minors to engage in sexual activity, in violation of Title 18, United States Code, Section 2422(b), production of child pornography, in violation of Title 18, United States Code, Section 2251(a), and sex trafficking of minors, in violation of Title 18, United States Code, Section 1591(a), (collectively, the "**Target Offenses**").

4.      This affidavit is first submitted in support of a criminal complaint and arrest warrant for HECTOR TORRES, with a date of birth of xx-xx-1989, charging him with coercion and enticement of minors to engage in sexual activity, in violation of Title 18, United States Code, Section 2422(b), and production of child pornography, in violation of Title 18, United States Code, Section 2251(a).

5.      This affidavit is also submitted in support of applications for search warrants under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 for the following:

a.      The Apple iPhone assigned call number 203-737-0455, which is serviced by T-Mobile, and used by HECTOR TORRES ("**Target Phone 1**");

b.      Information associated with the cellular device assigned call number 203-737-0455 ("**Target Phone 1**"), commonly known as cell-site data, that is in the custody or control of T-Mobile US, Inc., a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054;

c.      Information associated with the Snapchat account for user identification k.poet5 ("**Target Account**"), that is in the custody or control of Snap, Inc., headquartered at 2772 Donald Douglas Loop North, Santa Monica, California 90405; and

d.      A 2017 white Subaru Legacy with Connecticut registration AX46460 and Vehicle Identification Number 4S3BNAB65H3033376. ("**Target Vehicle**").

6.      **Target Phone 1** is an Apple iPhone assigned call number 203-737-0455, used by TORRES and serviced by T-Mobile US, Inc., headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054. For the reasons set forth in this affidavit, there is probable cause to believe that **Target Phone 1,** as further specified in Attachment A-1, is used by and is in the possession of TORRES, and that **Target Phone 1** contains evidence and contraband and constitutes an instrumentality of the **Target Offenses**, as further specified in Attachment B-1.

7.      The information to be searched associated with **Target Phone 1**, commonly known as cell-site data, is further specified in Attachment A-2. For the reasons set forth in this affidavit, there is probable cause to search the information described in Attachment A-2 for evidence of the **Target Offenses**, as described in Attachment B-2. The application for a search warrant seeks to require T-Mobile to disclose to the government the information further described in Section I of Attachment B-2. Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review the information to locate items described in Section II of Attachment B-2.

8.      The **Target Account** is a Snapchat account with user identification k.poet5 and is further specified in Attachment A-3. For the reasons set forth in this affidavit, there is probable cause to search the information described in Attachment A-3 for evidence, contraband, instrumentalities, and fruits of the **Target Offenses**, as described in Attachment B-3. The application for a search warrant seeks to require Snap, Inc. to disclose to the government the information further described in Section I of Attachment B-3. Upon receipt of the information described in Section I of Attachment B-3, government-authorized persons will review the information to locate items described in Section II of Attachment B-3.

9.      The **Target Vehicle** is a 2017 white Subaru Legacy with Connecticut registration AX46460 and Vehicle Identification Number 4S3BNAB65H3033376. According to Connecticut Department of Motor Vehicles records, the **Target Vehicle** is registered to TORRES at the **Target Residence**. For the reasons set forth in this affidavit, there is probable cause that the **Target Vehicle**, as further specified in Attachment A-4, contains items that constitute instrumentalities and evidence of the **Target Offenses**, as further specified in Attachment B-4;

10.     T-Mobile and Snap, Inc. are wireless communications service providers (collectively the "Service Provider"). As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

11.     The statements contained in this affidavit are based in part on information provided by witnesses with first-hand knowledge of the events described herein, other members of local, state, and federal law enforcement, data extracted from at least one cellular phone, my own investigation, to include personal observations, documents, and other investigative materials that I have reviewed, as well as on my training and experience as a Special Agent with the FBI.  Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, an arrest warrant, and search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause exists to support the issuance of search warrants, a criminal complaint, and an arrest warrant, and does not set forth all of my knowledge about this matter.

## SUMMARY OF PROBABLE CAUSE

12.     As described in more detail below, from on or about November 11, 2020, through on or about February 28, 2021, HECTOR TORRES, who was 31 years old, communicated via Snapchat, text message, and FaceTime with three minor girls, ages 11 and 12, to persuade, induce, entice or coerce them to engage in sexual activity with him. The minor girls, whose identities are

known to me, are hereinafter referred to as Minor Victim 1 ("MV1"), Minor Victim 2 ("MV2"), and Minor Victim 3 ("MV3"). MV1 and MV2 were each 12 years old at the time of the alleged conduct, and MV3 was 11 years old at the time of the alleged conduct. On multiple occasions in February 2021, TORRES picked up the girls and brought them to the parking lot of a shopping plaza in Hartford, Connecticut, where they each performed oral sex on him at TORRES's direction. As described below, investigators located at least three videos of TORRES's sexual abuse of these minor girls, including at least one video where it appears TORRES held the camera. In another video, the right side of TORRES's face is visible, as are two distinctive tattoos on his hands.

13.     HECTOR TORRES currently resides in Monroe, Connecticut. On March 30, 2021, T-Mobile provided responsive records pursuant to an administrative subpoena requesting subscriber information for telephone number 203-737-0455 ("**Target Phone 1**"), which, as described below, is a number used by TORRES to communicate with at least one of the minor girls. The responsive records identified the customer name as HECTOR TORRES and the subscriber name as Individual A, known to be TORRES's live-in girlfriend, with a service and billing address at his home in Monroe from March 19, 2018 through the date of the subpoena return, March 30, 2021.

14.     I conducted surveillance of TORRES's home on April 7, 2021, and I observed an individual, believed to be TORRES, leave in the **Target Vehicle.**

## STATUTORY AUTHORITY

15.     As noted above, this investigation concerns alleged violations of 18 U.S.C. § 2422(b) and 18 U.S.C. §2251(a), which are set forth here:

a.     18 U.S.C. § 2422(b) provides, "Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction

of the United States knowingly persuades, induces, entices, or coerces any individual who has not

attained the age of 18 years, to engage in prostitution or any sexual activity for which any person

can be charged with a criminal offense, or attempted to do so, shall be [guilty of a crime]."

   b. The term 'sexual activity for which any person can be charged with a

criminal offense' includes the production of child pornography. . . ." 18 U.S.C. § 2427.

   c. 18 U.S.C. § 2251(a) provides, "Any person who employs, uses, persuades,

induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose

of producing any visual depiction of such conduct . . . shall be punished . . . if such person knows

or has reason to know that such visual depiction will be transported or transmitted using any means

or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or

mailed, if that visual production was produced or transmitted using materials that have been mailed,

shipped, or transported in or affecting interstate or foreign commerce by any means, including by

computer, or if such visual depiction has actually been transported or transmitted using any means

or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or

mailed."

## DEFINITIONS

  16. The following definitions apply to this Affidavit:

   a. "Child Pornography," as used herein, includes the definition in 18 U.S.C. §

2256(8) ("any visual depiction including any photograph, film, video, picture, or computer or

computer-generated image or picture, whether made or produced by electronic, mechanical, or

other means of sexually explicit conduct, where (A) the production of such visual depiction

involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a

digital image, computer image, or computer-generated image that is, or is indistinguishable from,

that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct."), and also includes any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. §§ 2252 and 2256(2).

b. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. 18 U.S.C. § 1030(e)(1).

c. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

d. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that

creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e.    "Minor" means any person under the age of 18 years. 18 U.S.C. § 2256(1).

f.    "Sexually explicit conduct," as used herein "means actual or simulated—(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person;

g.    "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

h.    A "wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

i.      A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

j.      A "GPS" navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

## BACKGROUND INFORMATION REGARDING SNAPCHAT

17.      Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos. Referred to as "snaps," the company processes

approximately 700 million of them every day on Apple's iOS and Google's Android operating systems. Snapchat users access the application frequently; according to marketing material provided by the company, the average Snapchat user checks their account 20 times a day.

18.     Snap, Inc., headquartered in Santa Monica, California, owns and operates this service via a free access social networking website of the same name that can be accessed at http://snapchat.com. Through the service, users can make a "snap," which is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed, it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will not no longer be visible. The application notifies other users when they are online so that can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device.  Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123.  *See* 18 U.S.C. §§ 3127(1) and 2510(12).

19.     "Our Stories" is a collection of user submitted "Snaps" from different locations and events. A Snapchat user from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at an event could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories," a Snapchat user can keep a sort of photo/video diary using the "Story" feature.

Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

20.     While a Snapchat message may disappear, the record of who sent it and when it was sent still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status, including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

21.     Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

22.     Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's

application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

23.     Snapchat servers may contain data not recoverable from a user's mobile device if messages were not opened by users. Snapchat retains unopened snaps sent directly to a recipient for 30 days and an unopened snap in Group Chat for 24 hours. In addition, a user can save a message in Chat by pressing and holding the message. Snapchat servers may also contain data not recoverable from a user's mobile device due to the Memories function which is Snapchat's cloud storage service. Users can save their sent or unsent snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snapchat and may remain in Memories until deleted by the user.

24.     A Snapchat vanity name is different from the account's username. The vanity name can be changed by the user, but the username remains the same over time and is needed to particularly identify the account.

<u>**PROBABLE CAUSE**</u>

A.     **Initial Reports to Law Enforcement**

25.     On or about March 4, 2021, the mother of MV1 and MV2 filed a complaint with a local police department in Connecticut alleging that while the mother was using MV1's phone, the phone received a Snapchat message from a family friend, HECTOR TORRES. The mother then read through previous messages between TORRES and MV1 and saw messages from TORRES in which he asked for naked pictures of MV1, as well as conversations about TORRES performing sexual acts with MV1. The mother further reported that, according to MV1 and MV2, there were videos on MV1's phone of both MV1 and MV2 engaged in oral sex on TORRES.

26.     On or about March 5, 2021, a relative of MV3 (Witness 1) filed a complaint with a different police department in Connecticut. According to Witness 1, MV3 showed her a video of MV3's friend engaged in oral sex on an adult man, which had been downloaded to the phone via a Snapchat account. MV3 told Witness 1 that MV3 had also done "things" with the man, known to MV3 as HECTOR and later identified by law enforcement as HECTOR TORRES, who promised to buy MV3 a pair of shoes and vaping items. MV3 told Witness 1 that a video existed of MV3 engaged in oral sex on TORRES as well and that the video had been recorded in a grocery store parking lot located at 150 New Park Avenue in Hartford, Connecticut, on February 26, 2021. Additionally, Witness 1 discovered text messages between MV3 and the user of telephone number 203-737-0455, in which a person later identified as TORRES instructed MV3 to tell other people that it was a different HECTOR who communicated with them. MV3 told Witness 1 that HECTOR used telephone number 203-737-0455 (**Target Phone 1**).

**B.      Forensic Interviews of MV1, MV2, and MV3**

27.     On March 11 and 12, 2021, a trained child forensic interviewer conducted separate interviews of MV1, MV2, and MV3 at a Children's Advocacy Center in Connecticut. The interviews were video recorded. According to those videos, which I have viewed, the minor girls disclosed the following, among other things:

        a.     MV1 and MV2 stated that HECTOR TORRES was a person they knew through their family and that he was a "godbrother" or "uncle" to them. MV3 stated that she met HECTOR through MV1 and MV2. MV3 did not know HECTOR's last name.

        b.     They all communicated with HECTOR TORRES via Snapchat (sometimes in group chats) and also sometimes via text message and FaceTime, a video chatting application available on Apple iPhones.

c.      HECTOR TORRES promised to give them money and/or buy them things if they sent him photos of their bodies and/or performed oral sex on him. In particular, he promised to buy them Nike sneakers, vaping supplies, and food.

d.      HECTOR TORRES asked them to send him photos of their breasts, butts, and vaginas. MV1, MV2, and MV3 stated that, in response to TORRES's requests, they did send TORRES photos of their breasts and butts, but that they sent "fake" photos of their vaginas, meaning they searched online to find photos of other people's vaginas to send to him instead of sending their own.

e.      MV1, MV2, and MV3 each disclosed that they performed oral sex on TORRES at his request and direction at least one time in his car, which was parked in a shopping center parking lot in Hartford. Specifically, they each stated that they placed their mouths on TORRES's penis:

(i.)      MV1 stated that she performed oral sex on TORRES when she was in his car together with MV2 and MV3. According to both MV1 and MV3, MV3 recorded MV1 perform oral sex on TORRES with MV3's cell phone. This appears to be **Video 3** described below, which was located on MV3's cell phone.

(ii.)      MV2 stated that she performed oral sex on TORRES when she was alone with TORRES in his car and that TORRES recorded her doing it with his cell phone. This appears to be **Video 1** described below, which was located on MV3's cell phone. MV3 stated that she had a copy of this video on her phone because MV2 asked TORRES to send it to them, and he did.

(iii.)      MV3 stated that she performed oral sex on TORRES when she was in his car together with MV2, and that MV2 recorded her doing it with MV3's cell phone. This

appears to be **Video 2** described below, which was located on MV3's cell phone. MV3 further stated that she performed oral sex on TORRES another time when she was in his car with MV1 and MV2, and that she did so because TORRES was aggressive and she was afraid when he became angry.

f.       MV3 described TORRES's car as white and having four doors, black tinted windows, and black seats, which is consistent with the **Target Vehicle.**

g.       MV1 stated that she left her headphones in the **Target Vehicle** on the same day that she performed oral sex on TORRES.

**C.       Examination of MV3's Phone[1]**

28.       On or about March 8, 2021, I met with MV3 and her father. They gave me MV3's Apple iPhone 11 and signed a consent form to search the device. The Apple iPhone 11 is manufactured by Apple Inc., and no Apple iPhones are manufactured in Connecticut. The majority of Apple iPhones are manufactured China. In addition, Foxconn, the manufacturing company of Apple iPhones, maintains manufacturing facilities in Thailand, Malaysia, the Czech Republic, South Korea, Singapore, and the Philippines.

**i.  Videos in MV3's phone**

29.       I reviewed the digital extraction from MV3's iPhone and observed videos and images that contain child pornography, including the following three videos:

|         | Creation Date | Description |
|---------|---------------|-------------|
| **Video 1** | 2/24/2021 10:51:21 p.m. (UTC+0) | This video depicts a girl leaning over with her head near the lap of a man, engaged in oral sex on him. The man is seated on the left side of the video frame, and the video appears to be captured from the left side of the video frame, consistent with the man holding the camera. The girl has dark, curly |

---

[1] The cell phones of MV1 and MV2 are also being searched by law enforcement, but I do not yet have a full forensic report of those searches.

| | | |
|---|---|---|
| | | hair, is wearing a light-colored top, and is seated on the right side of the video frame. The man's face is not visible in this video as the camera is focused on the man's lap. Based on the interviews of MV1, MV2, and MV3, I believe the girl in this video is MV2. |
| **Video 2** | 3/4/2021 10:42:17 p.m. (UTC+0) | This video depicts a girl, known to be MV3, leaning over with her head near the lap of a man, engaged in oral sex on him. This video appears to be captured from the viewpoint of above, with the man seated on the left side of the video frame and MV3 on the right side of the video frame. The man's face is not visible in this video as the camera is focused on the man's lap. |
| **Video 3** | 2/27/2021 2:20:35 a.m. (UTC+0) | This video, which is captured inside a vehicle, depicts a girl leaning over with her head near the lap of a man, engaged in oral sex on him. The girl, who is seated in the front passenger seat, has dark, curly hair and is wearing a yellow and white striped top. The man is seated in the driver's seat, and the right side of the man's face is visible. I compared the man in this video with photos of HECTOR TORRES from the Connecticut Department of Motor Vehicles, and the man in this video appears to be TORRES. Based on the interviews of MV1, MV2, and MV3, I believe the girl in this video is MV1. This video appears to be filmed from the rear passenger side of the vehicle by an individual wearing jeans with a hole on the left thigh. An individual wearing pink, white, and black camouflage pants is seated in the rear driver's side seat. Even though the faces of these two individuals in the back seat of the vehicle are not visible, I believe they are MV2 and MV3 based on their clothing because there is another video on MV3's phone where MV2 and MV3 appear to be wearing the same clothing on the same day. |

30.     In **Video 3**, a large tattoo is visible on the top of the man's right hand, and a smaller tattoo is visible near the thumb on his left hand. I compared the tattoos in **Video 3** with photographs of TORRES's hand tattoos that were taken in 2019 by the Stamford Police Department, as seen below. The tattoos appear to be the same.



31.     Also in **Video 3**, the front driver's side compartment of the vehicle is viewable. A Subaru logo is displayed on the steering wheel, and the instrument cluster appears to be consistent with online stock images of a 2017 Subaru Legacy, which is the year, make, and model of the **Target Vehicle**.

      ii.     **MV3's Messages with TORRES**

32.     The search of MV3's phone further revealed text messages and chats with TORRES using both the text message feature on MV3's phone as well as through Snapchat.

33.     MV3's text messages with TORRES occurred via **Target Phone 1**, which was listed in MV3's contacts as "Hector~plug😺😖🦯🦯." Also associated with this contact in MV3's phone, via the WhatsApp application, was a photograph of a man. I compared that photograph with a photograph of TORRES from the Connecticut Department of Motor Vehicles, and it appears to be the same person.

34.     According to FBI's analysis of MV3's phone, in MV3's Snapchat conversations with TORRES, his side of the conversations occurred via chats with a 36-character Snapchat identifier ending in the letters and numbers "28f54f." The username and/or vanity name used by TORRES did not show up on FBI's phone analysis, most likely because TORRES had deleted his account by the time FBI received MV3's phone. However, FBI obtained a second copy of MV3's

Snapchat conversations with TORRES from Witness 1. Upon learning of the sexual contact between MV3 and TORRES, Witness 1 video recorded the Snapchat messages on MV3's phone. I reviewed Witness 1's video of MV3's Snapchat conversation with TORRES, and I saw that the message exchange appears to be the same conversation between MV3 and user identifier 28f54f from FBI's phone analysis.[2] On Witness 1's copy of the conversation, however, TORRES used the names "kabiosilee" and "k.poet5." The name "SHOWTIME" is also associated with TORRES on Witness 1's copy of the conversation. MV3 stated in her forensic interview that she knew HECTOR by the nickname "SHOWTIME."

35. Below are excerpts of some of the communications between MV3 and TORRES:

| Timestamp | From | Body | Format |
|---|---|---|---|
| 1/31/2021 5:05:42 PM (UTC+0) | MV3 | Hey hector I was wondering if you can drop [MV1 and MV2] off at my house today | Text message |
| 1/31/2021 5:21:00 PM (UTC+0) | **Target Phone 1** | Who's this? | Text message |
| 1/31/2021 5:21:14 PM (UTC+0) | MV3 | [Redacted MV3's name] | Text message |
| 1/31/2021 5:21:37 PM (UTC+0) | **Target Phone 1** | Oh idk[3] I'll try | Text message |
| | | | |
| 2/18/2021 6:01:31 AM (UTC+0) | TORRES | So Friday I just got home | Snapchat |

[2] MV3's conversation with TORRES that Witness 1 video recorded appears to be a more complete version of the conversation than the version downloaded by FBI from MV3's phone. This may be the result of TORRES deleting, or attempting to delete, the Snapchat conversation after Witness 1 recorded it, but before FBI was able to download it from MV3's phone.

[3] Based on my training and experience, I know that "idk" is often shorthand for "I don't know" when used in chats or text messages.

| | | | |
|---|---|---|---|
| 2/18/2021 6:02:21 AM (UTC+0) | MV3 | ? | Snapchat |
| 2/18/2021 6:08:44 AM (UTC+0) | TORRES | The mall | Snapchat |
| 2/18/2021 6:09:05 AM (UTC+0) | MV3 | ohhh ok | Snapchat |
| 2/18/2021 6:13:03 AM (UTC+0) | TORRES | ☺☺☺☺ | Snapchat |
| 2/18/2021 6:21:04 AM (UTC+0) | MV3 | No | Snapchat |
| 2/18/2021 6:24:51 AM (UTC+0) | TORRES | Suck till I cum | Snapchat |
| 2/18/2021 6:25:54 AM (UTC+0) | MV3 | ok🤣 | Snapchat |
| 2/18/2021 6:51:27 AM (UTC+0) | MV3 | Just the air forces[4] | Snapchat |
| | | | |
| 2/19/2021 5:41:48 PM (UTC+0) | TORRES | Hey | Snapchat |
| 2/19/2021 5:42:00 PM (UTC+0) | MV3 | Yo | Snapchat |
| 2/19/2021 5:45:47 PM (UTC+0) | MV3 | I'm sucking dick | Snapchat |
| 2/19/2021 5:50:06 PM (UTC+0) | MV3 | Yes | Snapchat |
| 2/19/2021 5:54:22 PM (UTC+0) | TORRES | Lit lol you excited Lmaoo jkjk | Snapchat |

---

[4] Based on my knowledge of this investigation and the interviews of the minor girls, "air forces" is likely a reference to Nike Air Force sneakers, which TORRES bought for MV1 and MV2.

| | | | |
|---|---|---|---|
| 2/19/2021 5:54:55 PM (UTC+0) | MV3 | Ahahaha ig lmao 🤣 | Snapchat |
| 2/19/2021 6:00:41 PM (UTC+0) | MV3 | you right🙂 🤣 | Snapchat |
| 2/19/2021 6:03:49 PM (UTC+0) | TORRES | After this whenever you wanna practice just lmk you can suck it anytime shit lmao 😊 I ain't gunna say no to head plus I'll tell you how to do it etc that way when you actually do it to a boy you like or boyfriend your going to be a beast at it and he going to be eating out your hard trust of you give good head you'll have any nigga whooped | Snapchat |
| 2/19/2021 6:07:08 PM (UTC+0) | TORRES | Yea I know but after today just use me for practice ima teach you how to be a beast watch your gunna have these niggas eating out of your hand worshipping the ground you walk on just take my advice trust | Snapchat |
| 2/19/2021 6:10:37 PM (UTC+0) | MV3 | igh[5] thx🤣😊 | Snapchat |
| | | | |
| 2/19/2021 9:57:29 PM (UTC+0) | TORRES | soo will your mom let you "go get food"? Before I go to your house I can get your sneakers then on the drive to get food or go to the store or w.e you suck it I'll give you the sneakers? | Snapchat |
| 2/19/2021 9:59:03 PM (UTC+0) | TORRES | I know but things don't go as planned just send another Toti pic[6] and I'll just get you a nape for both pics and we call it even | Snapchat |
| 2/19/2021 10:00:51 PM (UTC+0) | MV3 | I think ima go with the vape | Snapchat |
| 2/19/2021 10:01:03 PM (UTC+0) | TORRES | So no sneakers? | Snapchat |

[5] Based on my training and experience, I know that "igh" or "ight" is often shorthand for "alright" when used in chats or text messages.

[6] Based on my knowledge of this investigation, "toti pic" is likely a reference to a picture of MV3's breasts.

| | | | |
|---|---|---|---|
| 2/19/2021 10:01:09 PM (UTC+0) | MV3 | No | Snapchat |
| 2/19/2021 10:09:53 PM (UTC+0) | MV3 | mmm idk did she do it? | Snapchat |
| 2/19/2021 10:13:47 PM (UTC+0) | TORRES | Yea question is are you lol | Snapchat |
| 2/19/2021 10:14:07 PM (UTC+0) | MV3 | Maybe | Snapchat |
| 2/19/2021 10:14:16 PM (UTC+0) | TORRES | I'm around the corner | Snapchat |
| 2/19/2021 10:14:24 PM (UTC+0) | TORRES | So when I come back? | Snapchat |
| 2/19/2021 10:14:31 PM (UTC+0) | MV3 | Yes probably | Snapchat |
| 2/19/2021 10:14:34 PM (UTC+0) | TORRES | Or better now l? | Snapchat |
| 2/19/2021 10:16:47 PM (UTC+0) | TORRES | It's cool when I come back | Snapchat |
| 2/19/2021 10:17:02 PM (UTC+0) | MV3 | Yea sure | Snapchat |
| 2/19/2021 10:18:05 PM (UTC+0) | TORRES | Bet | Snapchat |
| 2/19/2021 11:13:53 PM (UTC+0) | TORRES | Lmaooo why 😊 | Snapchat |
| 2/19/2021 11:20:50 PM (UTC+0) | MV3 | Ok | Snapchat |
| 2/20/2021 12:45:45 AM (UTC+0) | TORRES | Leaving now | Snapchat |
| 2/20/2021 12:45:56 AM (UTC+0) | MV3 | Ok | Snapchat |

| 2/20/2021 2:45:40 AM (UTC+0) | MV3 | You have the video of me | Snapchat |
|---|---|---|---|
| 2/20/2021 2:49:54 AM (UTC+0) | MV3 | Ok | Snapchat |
| 2/20/2021 4:28:36 AM (UTC+0) | TORRES | Hey | Snapchat |
| 2/20/2021 4:29:26 AM (UTC+0) | MV3 | Hi | Snapchat |
| 2/20/2021 4:32:29 AM (UTC+0) | MV3 | thank you | Snapchat |
| 2/20/2021 4:33:05 AM (UTC+0) | MV3 | yea ofc[7] I won't tell no one | Snapchat |
| 2/20/2021 5:22:17 AM (UTC+0) | TORRES | 😂😂😂 | Snapchat |
|  |  |  |  |
| 2/23/2021 6:06:18 PM (UTC+0) | MV3 | Hecor | Snapchat |
| 2/23/2021 6:37:32 PM (UTC+0) | TORRES | [Redacted a version of MV3's name] | Snapchat |
| 2/23/2021 8:12:45 PM (UTC+0) | MV3 | And what vape you get | Snapchat |
| 2/23/2021 8:16:17 PM (UTC+0) | TORRES | Ima get it to you regardless I always keep my promises just gotta find time to do it I'm actually off tomorrow I can deff bring the vapes then | Snapchat |
| 2/23/2021 8:45:58 PM (UTC+0) | TORRES | Ok look at you get it lol | Snapchat |
| 2/23/2021 8:46:03 PM (UTC+0) | TORRES | You still a virgin? | Snapchat |

---

[7] Based on my training and experience, I know that "ofc" is often shorthand for "of course" when used in chats or text messages.

| 2/23/2021 8:46:29 PM (UTC+0) | MV3 | Yes | Snapchat |
|---|---|---|---|
| 2/23/2021 8:51:24 PM (UTC+0) | TORRES | He won't know the difference plus 1 your gonna fuck plenty guys in your life some even that you not in a relationship with 2 you gain experience and you'll do a good job your first time | Snapchat |
| 2/23/2021 8:51:48 PM (UTC+0) | MV3 | True | Snapchat |
| 2/23/2021 8:52:24 PM (UTC+0) | MV3 | I'll think about it | Snapchat |
| 2/24/2021 10:00:27 PM (UTC+0) | MV3 | Lmao maybe another day | Snapchat |
| 2/24/2021 10:03:40 PM (UTC+0) | MV3 | Hector ima need some money by my birthday [Redacted MV3's birthday] so if I suck it again before [Redacted MV3's birthday] you finna give me some money for me to suck it again | Snapchat |
| 2/25/20211:44:51 AM (UTC+0) | MV3 | [Redacted MV2's name] | Snapchat |
| 2/25/2021 1:46:07 AM (UTC+0) | MV3 | Idk lmao | Snapchat |
| 2/25/2021 1:48:00 AM (UTC+0) | TORRES | Ahhh okok | Snapchat |
| 2/25/2021 1:58:41 AM (UTC+0) | MV3 | Yea $40 | Snapchat |
| 2/25/2021 1:58:43 AM (UTC+0) | MV3 | Right | Snapchat |
| 2/25/2021 2:44:51 AM (UTC+0) | TORRES | I'm coming | Snapchat |
| 2/25/2021 2:44:54 AM (UTC+0) | TORRES | Address | Snapchat |
| 2/25/2021 2:45:49 AM (UTC+0) | TORRES | Be there in 12 min | Snapchat |

| | | | |
|---|---|---|---|
| 2/26/2021 8:47:17 PM (UTC+0) | MV3 | ima have to think about it, I would probably do it for $50 today because my parents are at work but idk it can't be too late because they will be back at like 9:00 or 7:00 some where around there | Snapchat |
| 2/26/2021 8:49:41 PM (UTC+0) | TORRES | Ok deal | Snapchat |
| 2/26/2021 8:49:47 PM (UTC+0) | MV3 | ok then | Snapchat |
| 2/26/2021 8:49:54 PM (UTC+0) | TORRES | Bet | Snapchat |
| 2/27/2021 1:51:55 AM (UTC+0) | MV3 | Yes | Snapchat |
| 2/27/2021 1:52:03 AM (UTC+0) | TORRES | Lmaoo lemme seeee | Snapchat |
| 2/27/2021 1:52:23 AM (UTC+0) | TORRES | Dale lol[8] | Snapchat |
| 2/27/2021 2:20:36 AM (UTC+0) | MV3 | [**Video 3** described above, believed to depict MV1, was attached to this message.] | Snapchat |
| 3/4/2021 | | Mother of MV1 and MV2 report videos to law enforcement. | |
| 3/4/2021 12:51:00 AM (UTC+0) | **Target Phone 1** | Tell em don't say nun I blocked her on snap tell her to say it was someone else and that I don't have them on snap only insta cuz she didn't have my name saved on snap only under sugar daddy H | Text |
| 3/4/2021 12:52:06 AM (UTC+0) | MV3 | She told them it was you already | Text |

---

[8] Based on my training and experience, I know that "dale" is often used as slang for "give it" or "go for it" when used in chats or text messages.

| 3/4/2021 12:53:50 AM (UTC+0) | **Target Phone 1** | Bro wtf noooo ima get in so much trouble tell em to say it was someone else or something wtf 😊😊 | Text |
|---|---|---|---|
| 3/4/2021 12:54:56 AM (UTC+0) | MV3 | Right I know they should have not said it was you but now it's too late her mom called her god father something liked that and she was basically crying on the phone with him | Text |
| 3/4/2021 12:56:14 AM (UTC+0) | **Target Phone 1** | Tell them to come up with something and say it wasn't me that she just agreed because she was nervous and she said it was me cuz her mom assumed it was me but that it wasn't me | Text |
| 3/4/2021 12:56:45 AM (UTC+0) | **Target Phone 1** | Please tell them to say it wasn't me plz ima get in trouble | Text |
| 3/4/2021 12:56:57 AM (UTC+0) | MV3 | ok | Text |
| 3/4/2021 12:57:11 AM (UTC+0) | **Target Phone 1** | Delete everything on your phone please yk[9] what I'm talking about | Text |
| 3/4/2021 12:57:31 AM (UTC+0) | MV3 | Ok | Text |
| 3/4/2021 12:57:56 AM (UTC+0) | **Target Phone 1** | Lmk[10] what's going on plz | Text |
| 3/4/2021 12:58:04 AM (UTC+0) | MV3 | ~/Library/SMS/Attachments/b7/07/49E4FAA9-4BC2-4407-BA09-4B9AFFA9C5A3/IMG_3562.jpg[11] | Text |
| 3/4/2021 12:59:52 AM (UTC+0) | **Target Phone 1** | How does she really know if it was me or not? Just tell her to say you didn't really let me talk it wasn't him I don't even have them on snap or something tell them anything but figure a way to say it wasn't me how hard is that | Text |

---

[9] Based on my training and experience, I know that "yk" is often shorthand for "you know" when used in chats or text messages.

[10] Based on my training and experience, I know that "lmk" is often shorthand for "let me know" when used in chats or text messages.

[11] MV3 sent a screenshot of a separate text conversation she was having with MV2.

| 3/4/2021 1:01:16 AM (UTC+0) | **Target Phone 1** | Do you know what [MV1's nickname] told her tho? | Text |
|---|---|---|---|
| 3/4/2021 1:01:27 AM (UTC+0) | **Target Phone 1** | So I know what's being said | Text |
| 3/4/2021 1:01:28 AM (UTC+0) | MV3 | No | Text |
| 3/4/2021 1:03:56 AM (UTC+0) | MV3 | Hecor [Redacted MV2's name] told me that her mom had you on snap and knows what your bitmoji looks like | Text |
| 3/4/2021 1:05:07 AM (UTC+0) | **Target Phone 1** | But I got them blocked and she don't got no SS or nothing all she has to say it wasn't Héctor it was someone else she didn't have my named saved either | Text |
| 3/4/2021 1:05:35 AM (UTC+0) | **Target Phone 1** | How is [MV2's nickname] writting you? She still got her phone? | Text |
| 3/4/2021 1:05:50 AM (UTC+0) | MV3 | She's texting me | Text |
| 3/4/2021 1:06:45 AM (UTC+0) | **Target Phone 1** | So ask her what [MV1's nickname] said to her mom so I can figure out something for her to say that's believable | Text |
| 3/4/2021 1:08:41 AM (UTC+0) | MV3 | ~/Library/SMS/Attachments/3e/14/83E6A288-E7AC-417F-A4EB-E9CBCC4A09D4/IMG_3565.jpg[12] | Text |
| 3/4/2021 1:09:21 AM (UTC+0) | MV3 | But hecor i did all that for shoes and still didn't get anything so you going to give me my shoes tho | Text |
| 3/4/2021 1:10:05 AM (UTC+0) | **Target Phone 1** | Yea I got you I been told you after my pinaldo | Text |
| 3/4/2021 1:10:32 AM (UTC+0) | MV3 | oh ok because i thought after all that you wasn't finna give me my shoes | Text |
| 3/4/2021 1:10:54 AM (UTC+0) | **Target Phone 1** | My ceremony is next week after the ceremony I got you | Text |
| 3/4/2021 1:12:03 AM (UTC+0) | **Target Phone 1** | Anyways so does she know I sent too?? Or she thinks only she sent? | Text |

---

[12] MV3 sent a screenshot of a separate text conversation she was having with MV2.

| 3/4/2021 1:12:13 AM (UTC+0) | MV3 | Idk | Text |
|---|---|---|---|
| 3/4/2021 1:12:18 AM (UTC+0) | MV3 | She isn't telling me | Text |
| 3/4/2021 1:12:54 AM (UTC+0) | **Target Phone 1** | Just tell her she sent it a long time ago by accident that she meant to send it to her bf that's it | Text |
| 3/4/2021 1:19:03 AM (UTC+0) | **Target Phone 1** | And that she apologized and I said I won't tell your mom this time just don't send people stuff like that yk like giving her advice for the future or some stupid shit like that | Text |
| 3/4/2021 1:19:42 AM (UTC+0) | MV3 | Did it work | Text |
| 3/4/2021 1:19:57 AM (UTC+0) | **Target Phone 1** | Did what work? | Text |
| 3/4/2021 1:20:17 AM (UTC+0) | MV3 | You said you told her mom t | Text |
| 3/4/2021 1:20:30 AM (UTC+0) | MV3 | To not send people stuff | Text |
| 3/4/2021 1:20:35 AM (UTC+0) | **Target Phone 1** | No I'm telling you to tell her to say that | Text |
| 3/4/2021 1:20:45 AM (UTC+0) | **Target Phone 1** | Reread the message | Text |
| 3/4/2021 1:21:07 AM (UTC+0) | MV3 | I can't she blocked me and texted me on iMessage saying she is with her mom and to not text her | Text |
| 3/4/2021 1:21:25 AM (UTC+0) | **Target Phone 1** | Ok well lmk | Text |

36.     In addition to the Snapchat and text messages, the search of MV3's phone showed

a call log of approximately 20 FaceTime communications with **Target Phone 1**, listed in  MV3's

contacts as "Hector~plug☺😕🍂🍂" for the time period of 2/6/2021 through 3/4/2021.

**D.      Evidence of TORRES's Contact with Other Minors**

37.      During MV1's forensic interview, she revealed that TORRES had been in contact with at least four other minor girls. Specifically, MV1 disclosed that she knew TORRES had communicated via Snapchat with a minor girl who was approximately 13 years old who lives in Massachusetts, and she provided a first name of that girl. MV1 stated that the 13 year-old girl from Massachusetts may have sent naked photos of herself to TORRES. MV2 and MV3 also stated that TORRES had communicated with the same 13 year-old girl form Massachusetts. MV1, MV2, and MV3 knew this because they participated in group chats with the girl and TORRES. FBI's investigation relating to TORRES's contacts with this minor girl is ongoing.

38.      In addition, MV1 knew that TORRES had communicated via mobile device with three other minor girls. MV1 stated that two of the girls were sisters, one was 16 years old and the other was approximately 13 or 14 years old. The last girl was approximately 12 or 13 years old. MV1 knew these three minor girls because they belong to the same religion as her family, but she did not know their names. MV1 indicated that TORRES told her the girls sent him pictures of their breasts and buttocks and that he had sent them a picture of his penis. FBI's investigation relating to TORRES's contacts with these minor girls is ongoing.

39.      In 2017, a parent of a different pre-pubescent minor girl reported to a local police department in Connecticut that the minor girl disclosed to her that TORRES had touched her vagina. When interviewed by a forensic child interviewer, the minor girl demonstrated how TORRES touched her by grabbing her vagina with her right hand and by making a rubbing motion. The investigation was closed in 2019 without charges against TORRES.

## <u>CHARACTERISTICS OF ADULTS WHO PRODUCE,</u>
## <u>DISTRIBUTE, RECEIVE, AND/OR POSSESS CHILD PORNOGRAPHY</u>

40.     Based upon my knowledge, experience, and training in child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to many individuals involved in such crimes:

a.     Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.     Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.     Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child-pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home, or in some other secure location. This is especially true for producers of child pornography

who possess new, one-of-a-kind, child pornography that they created because such child pornography is particularly valuable to them and for trading with others.

        d.      Likewise, those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. In my training and experience, such individuals who reside with other people may attempt to conceal their collections in places other than their residence, including their vehicle(s), as a way to prevent discovery by others. Furthermore, such individuals often transfer their collections of child pornography from one device to another, or back up the files to other devices, in order not to lose their collections. In addition, such individuals often transfer their collections of child pornography off of devices that they carry around with them, such as cell phones, to smaller external devices that are easier to hide.

        e.      Those who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with others to share information and materials.

        f.      Based on my training and experience, and the training and experience of other agents, I know that the sexual abuse minors can result in blood, DNA, or other biological, physical or trace evidence of sexual activity, and that such evidence can remain in the location of the sexual abuse until removed, by cleaning, environmental factors, or otherwise. I know that such evidence has been recovered by law enforcement in the past well beyond six weeks, even months later.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

    41.    As described above and in Attachment B-4, this application seeks permission to search for records that might be found at the **Target Vehicle**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage

I know that **Target Phone 1** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant or "PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

43.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

44.     *Probable cause.*  I submit that if a computer or storage medium is found on the **Target Vehicle**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.     *Forensic evidence.*  As further described in Attachment B-1 and B-4, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Vehicle** and on **Target Phone 1** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also

indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.       I know that when an individual uses a computer or cell phone the individual's computer or cell phone will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer or cell phone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer or cell phone is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer or cell phone used to commit a crime of this type may contain: data that is evidence of how the device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

46.       *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the

computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

47.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### Background on Cell-Site Data

48.     In my training and experience, I have learned that the T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

49.     Based on my training and experience, I know that T-Mobile can collect cell-site data about **Target Phone 1**. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

50.     I also know that some cellular service providers also generate geolocation information in the form of timing advance records, which are used by network engineers to optimize the cellular network and record the date and time of usage, duration, communication type, cellular tower / sector utilized, and estimated distance between the phone and cellular site are included. The estimated distance between the phone and cellular tower is calculated using the time it takes for a

signal to travel from the cellular site to the cellular device and then back to the cellular site.  These technologies can be referred to as Timing Advance / Time Difference of Arrival (TDOA), and may also have specific terminology that is used by individual cellular service providers, including Round Trip Time or Real Time Tool ("RTT") by Verizon Wireless, Per Call Measurement Detail ("PCMD") by Sprint, and TrueCall by T-Mobile. AT&T also generates records with estimated location information of devices on its network which are called **N**etwork **E**vent **LO**cating Service ("NELOS") reports. Timing advance and similar geolocation reports can be utilized to approximate an area where the phone was located at the time of the communication.

51.     Based on my training and experience, I know that T-Mobile typically collects and retains information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that T-Mobile typically collects and retains information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Phone 1's** user or users and may assist in the identification of co-conspirators and/or victims.

52.     In my training and experience, it is known that while the requested information may reveal inculpatory evidence that further shows the listed suspect was involved with the specified crime, there may be exculpatory information also contained within the records requested. For example, the records may show the specific mobile device was in the area of the crime at the time of the crime; however, when reviewed in totality within the entire data set requested, it is possible

the mobile device frequents that area and is perfectly consistent with typical patterns and trends identified within the requested data set.

53.     While it is not the intent of a search warrant to preserve exculpatory evidence, in this specific request we are requesting information that we know will be purged based on the retention periods defined by T-Mobile. Given the totality of requesting information that is Electronically Stored Information (ESI) with a known retention period, the possible inculpatory and exculpatory nature of these records, in addition to the Government's requirement to preserve all potential evidence in the course of a criminal investigation, I am requesting a time period of February 1, 2021 to March 4, 2021.

54.     Given the nature of the crime alleging that TORRES travelled to pick up MV1, MV2, and MV3 on multiple occasions and brought them to a location to engage in sexual activity with them, I believe it is reasonable and appropriate to request this period of time. Furthermore, there is probable cause to support the requested records are of evidentiary value and the act of preserving the requested period of time is within the "best practices" of preserving digital evidence as well as ESI.

## CONCLUSION

55.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) based on the facts set forth above.

56.     Based on the information in this affidavit, I request that this Court issue a warrant pursuant to Federal Rule of Criminal Procedure 41, authorizing the search of **Target Phone 1** as more fully described in Attachment A-1, for the items more specifically identified in Attachment B-1.

57.     I further request that this Court issue a warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41 authorizing the search of information associated with **Target Phone 1** further described in Attachment A-2, and I request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B-2 that is within its possession, custody, or control.

58.     I further request that this Court issue a warrant pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41, authorizing the search of information associated with  the **Target Account** further described in Attachment A-3, and I request that the Court direct Snap, Inc. to disclose to the government any information described in Section I of Attachments B-3 that is within its possession, custody, or control.

59.     Based on the information in this affidavit, I request that this Court issue a warrant pursuant to Federal Rule of Criminal Procedure 41 authorizing the search of the **Target Vehicle**, as more fully described in Attachment A-4, for the items more specifically identified in Attachment B-4.

60.     Finally, based on the information in this affidavit, I also submit that there is probable cause to believe, and I do believe, that HECTOR TORRES knowingly persuaded, induced, enticed or coerced a minor to engage in sexual activity for which any person can be charged with a criminal offense, in violation of 18 U.S.C. §2422(b), and knowingly used, persuaded, induced, enticed, or coerced a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct, in violation of 18 U.S.C. §2251(a). Accordingly, I respectfully request that a criminal complaint and arrest warrant be issued authorizing the arrest of HECTOR TORRES on those charges.

61.     To the extent these warrants will be served on a Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

BRIAN HANKO   Digitally signed by BRIAN HANKO
Date: 2021.04.12 13:32:18 -04'00'

Brian Hanko
Special Agent
Federal Bureau of Investigation

The truth of the foregoing affidavit has been attested to me by FBI Special Agent Brian Hanko over the telephone on April ⎽⎽12⎽⎽, 2021.

S. Dave Vatti   Digitally signed by S. Dave Vatti
Date: 2021.04.12 13:51:14
-04'00'

HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE